IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Habeeb Abdul Malik, #231677, a/k/a/ Ron Tearia Nichols | ) ) ) | Civil Action No.: 8:08-1886-RBH-BHH |
| Plaintiff, | ) ) ) | **REPORT AND RECOMMENDATION** |
| vs. | ) ) | **OF MAGISTRATE JUDGE** |
| Robert Ward, *et al.*, | ) ) ) | |
| Defendants. | | |

The plaintiff, a state prisoner proceeding *pro se*, seeks relief pursuant to Title 42, United States Code, Section 1983. This matter is before the Court on the defendants' motion for summary judgment. [Doc. 90.]

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983, and submit findings and recommendations to the District Court.

## FACTUAL BACKGROUND

On January 15, 2004, several inmates in one wing of the Special Management Unit of the Broad River Correctional Institution ("BRCI") escaped from their cells. (Murphy Aff. ¶ 8.) Officers were taken hostage and/or were trapped by the inmates. *Id.* ¶ ¶ 11, 12. Some inmates were observed pulling out their mattresses and setting them on fire. *Id.* ¶ 14. The Special Operations Response Team (SORT) and the Rapid Response Team (RRT) were both mobilized and dispatched to the BRCI, and those teams regained control of the SMU unit. *Id.* ¶ ¶ 16, 17. None of the named Defendants were members of the SORT or RRT teams.

The plaintiff alleges in this lawsuit that he was subjected to excessive force in the

aftermath of the riot. Specifically, he contends that after being restrained in handcuffs he was kicked, beaten, maced, struck with an electric shield, and denied food and other basic human necessities by the defendants. (Verified Compl. at 5-8.) The plaintiff also contends that his hair was forcibly shaved. *Id*. The defendants have produced evidence that the shaving of the inmates hair was necessary because two sets of keys went missing during the riot and it was critical to determine whether they had been hidden, along with other contraband, in the long or dreadlocked hair of the inmates. (McCants Aff. ¶ ¶ 14-15.)

## APPLICABLE LAW

Rule 56 of the Federal Rule of Civil Procedure states as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of it existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all interferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the petitioner's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

## DISCUSSION

The plaintiff contends that the actions of the defendant violated his Eighth Amendment right to be free from Cruel and Unusual Punishment. (Verified Compl. at 8); U.S. Const. amend VIII. Apart from a state law claim which has previously been dismissed [Doc. 47], the plaintiff has pled only a violation of his Eight Amendment right, pursuant to 42 U.S.C. § 1983. (Verified Compl. at 8.) There exist, however, seemingly two factual predicates. The one is the actual physical subjugation alleged by the plaintiff, following the riot. The second is the forced haircut. The Court will refer to the former as the "excessive force" claim and the later as the "forced haircut" claim, for clarity.[1] It seems that they are not precisely subject to the same defenses, namely exhaustion.

---

[1] The Court would not interpret the plaintiff's Complaint to include any specific claim regarding incidents after the plaintiff was transferred from the BRCI. [See Doc. 1.]

3

## I.    Statute of Limitations

The defendants first contend that the plaintiff's federal law claims are barred by the applicable statute of limitations.  (Def. Mem. Supp. Summ. J. at 3.)  Borrowing from relevant state law, as prescribed by the United States Supreme Court, *Wilson v. Garcia*, 471 U.S. 261 (1985), this district and circuit have agreed that "[t]he statute of limitations for section 1983 causes of action arising in South Carolina is three years." *Hamilton v. Middleton*, 2003 WL 23851098, at *4 (D.S.C. 2003); S.C. Code § 15-3-530(5); *see also Simmons v. South Carolina State Ports Authority*, 694 F.2d 64, 64 (4th Cir. 1982) (borrowing prior state limitations period for Section 1983 claim).

It is undisputed that the alleged excessive force was used against the plaintiff, if at all, on January 15, 2004.  Accordingly, the plaintiff had, until January 15, 2007, to file his present claims.  The effective date of this lawsuit was May 7, 2008 [see Doc. 1, 47], over four years from the date of the alleged violation.

The plaintiff contends, however, that the statute of limitations was tolled during such time as he attempted to exhaust his administrative remedies, as required by the PLRA, 42 U.S.C. § 1997e.  The Court would agree. Although it does not appear that the Fourth Circuit has addressed the issue, other circuits have concluded that federal courts should toll state statutes of limitations while inmates exhaust their administrative remedies under 42 U.S.C. § 1997e.  *See, e.g., Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir.2000); *Harris v. Hegmann*, 198 F.3d 153, 157-59 (5th Cir.1999). Currently, it appears that this district agrees, based on application of state tolling requirements.  *See Peoples v. South Carolina Dept. of Corrections*, 2008 WL 4442583 (D.S.C. September 25, 2008). Accordingly, the

undersigned will consider the three-year statute of limitations as having been tolled during the pendency of any attempts by the plaintiff to exhaust his administrative remedies.

There is no question but that the plaintiff is out of time on the forced haircut element of his claim. The plaintiff received and signed for the SCDC's final response to his Step 2 Grievance concerning that portion of his claim, on April 14, 2005. (Coleman Aff. ¶ 2 [sic] [¶ 3], Ex. B.) Accordingly, that claim was exhausted over three years prior to the date of filing of the Complaint in this case, on May 7, 2008 [Doc. 1], even accounting for any tolled time.

The tolled period for consideration of the excessive force element of the plaintiff's claim is less apparent. The defendant has put forward evidence that the plaintiff's attempts to exhaust the excessive force element of his claim ended, on August 5, 2004, when he expressly abandoned it in his Step 2 Grievance. (Coleman Aff., Ex. B.) Specifically, the plaintiff filed a Step 1 Grievance, Number BRCI-551-04, concerning two matters: (1) excessive force allegedly used during the riot, on January 15, 2004, and (2) a forced haircut, in derogation of his religious beliefs, on that same day.[2] *Id*., Ex. A. The Step 1 Grievance was denied on July 24, 2004. (Coleman Aff. ¶ 2.) On August 5, 2004, the plaintiff filed a Step 2 Grievance, as required. *Id*. But in that Grievance he stated, "**I am only concerned with the Hair issue. . . . All other allegations are of no concern**." (Coleman Aff., Ex. B (emphasis added).) In an another Grievance, Number MSU-243-04, which concerned an unrelated matter, the plaintiff again makes reference to *abandoning*

---

[2] This Grievance also included a complaint regarding application of SCDC's general hair grooming policy. (Coleman Aff., Ex. A.)

the excessive force element of his 551-04 Grievance: Regarding the 551-04 Grievance he states, "All other issues initially submitted in the step one were limited to this one particular [forced haircut] issue." (See Coleman Supp. Aff., Ex. B.)

The plaintiff responds that he did not abandon the excessive force issue but instead complained of it in a separate grievance, pursuant to SCDC policy. (See Pl. Resp., Ex. B.) This is a new argument. His Complaint references only one grievance, filed January 28, 2004, [Doc. 1 at 2], the date that the 551-04 Grievance was filed (Coleman Aff., Ex. A). For the first time in his Response brief, the plaintiff contends that he submitted a separate Step 2 Grievance regarding the excessive force issue but not a separate Step 1 Grievance. (See Pl. Resp., Ex. B.) The plaintiff claims that this allegedly separate Grievance was necessary because he was specifically instructed by the defendants that SCDC policy permits only one issue per Grievance form. (Pl. Resp., Ex. A.)

There are problems with the plaintiff's position. First, the newly referenced and second Step 2 Grievance is entirely unprocessed. It has no notation but the plaintiff's own handwriting. (See Pl. Resp., Ex. B at 2.) The face of the document itself is empty of any indication, whatsoever, that it was ever submitted to, or considered by, the defendants. It has no intake notation, decision, or signature of an SCDC official. *Id*. Standing on its own, the Court would not believe it suitable for consideration by a jury.

Second, the plaintiff has not produced any evidence that he was actually *instructed* to file this second alleged Grievance, as he alleges. He claims to have been told by the Grievance Coordinator, on or around April 2004, that he needed to amend his Grievance accordingly. (Pl. Resp. at 1.) But the plaintiff has only referenced the boilerplate

instruction on the Grievance form itself, in support. (Pl. Resp. Ex. A.) The Court would take judicial notice that it has routinely seen Step 1 Grievances rejected, in writing, for this precise issue – failure to limit Grievance to one issue. No such rejection occurred here. In fact, the defendant dealt directly with the merits of the excessive force issue, included in the Step1 Grievance, by concluding that the plaintiff's "allegations of excessive use of force are unsubstantiated and without merit." (Coleman Aff. Ex. A.) The Grievance was not returned for a failure to separate the haircut and excessive force claims. *See id.* There is no evidence whatsoever that the plaintiff's Step 1 Grievance was rejected for containing more than one complaint or that the plaintiff was otherwise encouraged to file a separate Step 2 Grievance. It strains credulity to believe he would have done so gratuitously. And, as the defendant has pointed out, it is a mysterious thing that the plaintiff, if under the impression he needed to separate the issues originally included in his 551-04 Grievance, would have not refiled the excessive force claim in a Step 1 Grievance. Rather, he contends that he bifurcated the issues by simply filing a separate Step 2 Grievance. (See Pl. Resp. Ex. B at 2.)

This seems unlikely for a second reason. Namely, this second Step 2 Grievance was allegedly submitted, on May 13, 2004, *before* the defendants' response, on July 21, 2004, to the original and only Step 1 Grievance. (Coleman Aff. Ex. A.) So why the plaintiff would have filed a second Step 2 Grievance prior to any specific determination on his Step 1 claims and why the SCDC would resolve the merits of the excessive force claim, if the plaintiff had previously been instructed to file a separate grievance, does not seem the subject of an easy explanation.

For all of these reasons, the Court is inclined to recommend that the plaintiff's excessive force claim was exhausted, on August 5, 2004, when he expressly abandoned it (Coleman Aff., Ex. B), and, therefore, out of time as his present Complaint was not filed until over three years later, on May 7, 2008.

But to this convoluted set of facts, the plaintiff would add one more. Specifically, the plaintiff has alleged that, as a result of this separate Step 2 Grievance, the defendants actually referred the excessive force claim to its Division of Internal Affairs, where consideration of it was substantially delayed, even beyond the SCDC's own policy that grievances will be processed within 105 days. (Pl. Resp. at 3; Pl. Sur-reply at 4; Def. Reply at 3.) The plaintiff contends that as a result of the delay, he was forced to file an appeal to the administrative law division. (See Pl. Sur-reply at 4.) The defendant responds that the "mystery" and unprocessed Step 2 Grievance was, in fact, drafted by the plaintiff for the sole purposes of submitting it with this appeal. That is one reasonable, even likely, explanation.

The decision of the administrative law judge, however, which dismissed the appeal, expressly states that the *defendants* indicated that the plaintiff's grievance had, in fact, "been forwarded to the Division of Internal Affairs for investigation and that this investigation has not yet been completed." (Pl. Resp., Ex. B. at 6.) This evidence does two things. One, it corroborates the plaintiff's claim that he was told that the Grievance had been so forwarded and, two, it leaves open the possibility that it was, in fact, forwarded as a result of the seemingly unprocessed and second Step 2 Grievance.

The defendant rejoins, however, that all of this is mooted by the fact that even

conceding everything that the plaintiff would allege, the Warden, subsequent to both (1) the submission of the plaintiff's alleged second Step 2 Grievance and (2) the decision of the ALJ, on July 15, 2004 (Pl. Resp. Ex. B), denied the express merits of the plaintiff's excessive force claim **to which the plaintiff filed no follow-up grievance or appeal**.  The Court believes that this point likely settles it.

The plaintiff would insist that he had no notice of the denial of the excessive force element of his Grievance until after he himself made separate inquiries and was informed by the Grievance Administrator, in August 2005.  (Pl. Sur-reply at 4.)    He has made no argument, however, as to why he thinks his prematurely submitted Step 2 Grievance made *prior* to the defendants' response to his Step 1 Grievance, if at all, somehow absolves him of his responsibility to actually contest the Step 1 determination, once rendered.  The Step 1 decision flatly rejects the excessive force claim (Coleman Aff., Ex. A) and, subsequent to it, the plaintiff made **no** further appeal, at Step 2 or otherwise, of that decision.  To the extent he was confused, he preceded at his own peril in reliance on an improperly filed Step 2 Grievance.

The Court has not found any case on point.  But, as a matter of law, it seems that a prisoner ought not be considered to have satisfied the burdens of exhaustion if he takes out of order the prescribed steps.  And, while the plaintiff complained that he was instructed to separately file his excessive force grievance, there is no evidence at all that such a demand meant that he file, out of turn, a *Step 2* Grievance, where no Step 1 resolution even existed.  At best, it can be imagined that he might have been urged to file a separate *Step 1* Grievance, although there exists no evidence on this point either.

Accordingly, the Court does not believe that any issues of fact exist as to the plaintiff's efforts to exhaust his excessive force claim or as to the time, in which, it was in fact administratively resolved. He implicitly and expressly abandon the claim on August 5, 2004 (Coleman Aff., Ex. B), and, yet failed to file any Complaint in this Court until May 7, 2008. It is out of time by over three quarters of a year.

## II.    Exhaustion

For much of the same reasoning as above, the Court would find the excessive force element of the plaintiff's claim unexhausted. The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust administrative remedies before filing a §1983 action concerning his confinement. 42 U.S.C.A. §1997(e) states:

> No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

In *Porter v. Nussle,* 534 U.S. 516 (2002), the United States Supreme Court held that the exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes. In *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006), the United States Supreme Court held that the PLRA exhaustion requirement requires proper exhaustion. The Court stated that "[a]dministrative law requires proper exhaustion of administrative remedies which means using all steps that the agency holds out, and doing so properly." *Id.* at 90. (Internal quotations and citations omitted). Failure to exhaust all levels of administrative review is not "proper exhaustion" and will bar actions filed by inmates under any federal law, including §1983. *Id.*

The Court takes notice that in order to exhaust the SCDC administrative remedies, an inmate must fill out a Form 10-5 or Step 1 grievance about the matters raised in his complaint and give the form to the Institutional Inmate Grievance Coordinator within fifteen (15) days of the alleged incident of which the inmate complains. (See generally Coleman Aff., Ex. A, B & Coleman Supp. Aff.) The Warden must respond to the Step 1 grievance in writing no later than forty (40) days from the filing of the initial grievance. If the inmate is not satisfied with the Warden's response, he must file an appeal of the Step 1 grievance response by filing a Form 10-5a or Step 2 Request for Responsible Official Review with the Inmate Grievance Coordinator within five (5) days of the receipt of the response from the Warden. A responsible official has sixty (60) days to respond to the Step 2 grievance. The decision of the official who answers Step 2 is considered the SCDC's final response in the matter. Only after completing both Steps 1 and 2 in the SCDC grievance process has an inmate properly exhausted a claim under §1983. 42 U.S.C. § 1997e. Further, exhaustion is a prerequisite to suit that must be completed prior to filing an action. *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 677 (4th Cir. 2005).

Because the plaintiff filed, at best, a premature Step 2 Grievance, not in response to any Step 1 determination of the defendant, and because the only responsive Step 2 Grievance before the Court, expressly abandons the excessive force element of his claim, it cannot be said that the plaintiff ever satisfied the strictures at Step 2. Accordingly, he failed to exhaust that element of his claim.

### III.     Excessive Force Claim

To the extent the district court rejects the recommendation concerning the statute of limitations argument, however, the undersigned could not recommend dismissal of the excessive force claim on the merits.   As discussed, the plaintiff makes an Eighth Amendment claim that the defendants used excessive force against him after a prison riot, in which he claims to have not participated. Specifically, the plaintiff contends that, on January 15, 2004, after the riot had been quelled, all doors locked, and all inmates subdued, that the defendant officers reentered the unit and "viciously punched and kicked him." (Verified Compl. ¶ 4; Pl. Resp. at 9-10.)  The plaintiff contends that while he was "restrained and shackled" the defendants beat him "without provocation" and "shocked him repeatedly" with an "electric shield." (Verified Compl. ¶ 4.)  The plaintiff's allegations have been generally corroborated by the eye witness accounts of two other inmates.  (See generally Fripp Aff., Murphy Aff.)

To establish an Eighth Amendment claim for cruel and unusual punishment, the plaintiff must prove: (1) objectively, the deprivation of a basic human need was sufficiently serious, and (2) subjectively, the prison officials acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The subjective component requires the inmate to show that the officers applied force not "in a good faith effort to maintain or restore discipline," but rather applied force "maliciously and sadistically for the very purpose of causing harm."  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  The objective component requires the inmate to prove that the use of force was more than *de minimis* or, in the alternative, that it was repugnant to the conscience of mankind.  *Id*. at 9-10.  *De minimis*

injury can be conclusive evidence that the force used was also *de minimis* and, therefore, not violative of constitutional protections. *See Norman v. Taylor*, 25 F.3d 1259, 1264 (4th Cir.1994).

### A. Objective Component

The defendants sole argument is that the plaintiff has not suffered more than *de minimis* injuries. The medical records present a mixed bag on this point. The plaintiff was seen by medical the same day as the riot, on January 15. (Pridgen Aff., Ex.) Although the records indicate that the plaintiff complained that his arms and hands hurt from the tightness of the handcuffs, the nurse observed "no broken skin" and indicated that his circulation was good. *Id*. The record on that date states that the plaintiff voiced no other complaints. *Id*. The plaintiff was next examined on January 17, 2004, when a nurse completed a Medical Screen form upon his intake at MSU. *Id*. LPN Charles Mitchell noted: "no complaints noted." *Id*. On January 22, however, the plaintiff was seen again. *Id*. On that visit, he complained of numbness in his index finger and thumb as a result of the restraints; pain in his ribs and ankles; and that he had been vomiting. *Id*. But, the nurse also noted that there was no swelling in the ankles; the plaintiff had a "normal gait;" and there was no pain upon palpation. *Id*.

As to the objective component of the test for excessive force, an injury is "sufficiently serious" if it rises above the level of *de minimis* harm. *Hudson*, 503 U.S. at 9-10. *De minimis* injury can be conclusive evidence that the force used was also *de minimis* and, therefore, not violative of constitutional protections. *See Norman v. Taylor*, 25 F.3d 1259, 1264 (4th Cir.1994). "[N]ot every push or shove, even if it may later seem unnecessary in

the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973). *See also Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir. 1996) (holding prison officials are entitled to use appropriate force to quell prison disturbances, and acting under pressure without the luxury of a second chance, an inmate must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm).

It appears that issues of fact remain as to whether the plaintiff can establish the objective element of his claim. The type of injuries actually reflected by the medical records is not entirely clear, although fairly unimpressive. The medical records present a markedly different story than the one described by the plaintiff wherein he contends that his "face was badly bruised and swollen" and he was left on the floor for "approximately 6.5 hours covered in mace and was never allowed to wash off the mace from his skin and eyes." (Pl. Resp. at 11, 13.) But, the Court need not precisely decide whether the alleged injuries themselves constitute something more than *de minimis*, as a matter of law. The plaintiff has brought forward evidence, which if believed, would justify a jury's conclusion that the defendant officers assaulted him without provocation and while in restraints. If that were the jury's conclusion, then a showing of any particular magnitude of injury would be unnecessary in the Court's estimation.

Specifically, some "force will cause relatively little, or perhaps no, enduring injury, but nonetheless will result in an impermissible infliction of pain." *Norman*, 25 F.3d at 1264. Where the circumstances involve either force which is "repugnant to the conscience of mankind," or the pain, described, can properly be said to constitute more than *de minimis*

injury, no specific injury need be shown. *Norman*, 25 F.3d at 1264. The Court believes that unprovoked physical assaults, punches to the face, kicks to the ribs, prolonged exposure to mace without the ability to wash, and unwarranted use of an electric shield against a defenseless inmate constitue acts "repugnant to the conscience of mankind," regardless of the extent of damage inflicted. These allegations amount to more than the random push or shove. *Cf. Norman*, 25 F.3d 1259 (keys swung at an inmate's face striking his thumb was *de minimis* force); *Gavin v. Ammons*, 21 F.3d 430 (7th Cir. 1994) (guard pulling inmate's hair was *de minimis* force); *Jackson v. Pitcher*, 966 F.2d 1452 (6th Cir. 1992) (guard stomp on hand of inmate was *de minimis* force). Rather, these alleged incidents implicate basic issues of human "dignity." See *Hope*, 536 U.S. at 738.

To succeed on this view of the objective component, the plaintiff must allege incidents which one would reasonably anticipate might be capable of inflicting severe pain and indignity without leaving any particular and tangible evidence of injury. Use of an electric shield and kicks and blows to the body without provocation and while the inmate is restrained, would seem to qualify. Likewise, use of mace against a restrained inmate without the opportunity to remove the munitions for an excess of six hours might also satisfy the objective element of his claim. *Cf. Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996) (involving more severe allegations but including restraint for more than 8 hours including continued exposure to munitions). The plaintiff has also alleged that he was placed in a cell "barren of the basic human necessities" and "denied food for a period of seven (7) days." (Verified Compl. at 7.)

The plaintiff's testimony is not very consistent or credible on these points, of course.

For instance, he contends that his face was badly beaten but that he was not seen until January 22, seven days later, at such time as the damage had allegedly diminished. (Pl. Resp. at 11.) The records indicate, however, that he was seen the same day and that no such injuries were observed. (Pridgen Aff., Ex.) The Court, however, cannot make the call. Such issues of fact, even if dubious, are not suitable for resolution on summary judgment.

### B. Subjective Component

The defendant has made no argument concerning the subjective element of the plaintiff's excessive force claim and so the plaintiff was not obligated to respond with evidence creating issues of fact. Even still, the Court would make the following brief comments. To prove the subjective component of his claim, the plaintiff must show that an officer acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). The state of mind required in excessive force claims is "wantonness in the infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 322 (1986). "Put differently, the core judicial inquiry regarding the subjective component of an excessive force claim is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir.2008) (internal quotations and citation omitted).

In *Whitley*, the Supreme Court set forth four non-exclusive factors to assist courts in assessing whether an officer has acted with "wantonness": (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) the extent of any reasonably perceived threat that the application of force

was intended to quell; and (4) "any efforts made to temper the severity of a forceful response." *Whitley*, 475 U.S. at 321 (internal quotations omitted) (applying these factors in a prison riot case); *see Hudson*, 503 U.S. at 7 (extending the *Whitley* standard "to all allegations of excessive force").

Even on the facts before it, the Court could conclude that the plaintiff has created issues of fact regarding the subjective component of his claim. If the plaintiff's version of the facts are believed, then a reasonable jury would be justified in concluding that there was no reason for the force used because the disturbance had been quelled; that the force was, thus, disproportionate to any perceived threat; and, therefore, was applied sadistically and maliciously and not in a "good-faith effort to maintain . . . discipline" and security, *Iko*, 535 F.3d at 238. As stated, the plaintiff claims that the defendant officers assaulted him without provocation while he was in restraints. Actions "totally without penological justification" can constitute "unnecessary and wanton inflictions of pain." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (quotations omitted).

Moreover, the defendant officers would not enjoy qualified immunity for such actions, as alleged. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At all times relevant to this case, the defendants would have been fully aware that the plaintiff's right to be free from force employed "maliciously and sadistically for the very purpose of causing harm" was clearly established and that they could not physically assault the plaintiff without cause. *See Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).

Although the defendants dispute the plaintiff's version of the events alleged, the plaintiff's testimony and the accompanying inmate affidavits create issues of fact as to the

his claim.

## IV.    Qualified Immunity

The defendants contend that they are entitled to qualified immunity regarding the plaintiff's claim that he was given a forced haircut. The defendants contend that the forced haircut was necessary because, in the course of the riot, two sets of keys went missing, which belonged to officers who were attacked. (McCants Aff. ¶ ¶ 14-15.) Cutting the inmates hair reduced security risks and increased efficiencies in searching the long hair and/or dreadlocks of inmates who might have either been hiding the keys or weapons in their hair. *Id*.

In *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), the United States Supreme Court held that "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 818.

The Court of Appeals for the Fourth Circuit, discussing qualified immunity, stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged."

Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

*Wiley v. Doory,* 14 F.3d 993 (4th Cir.1994) (internal citations omitted).  Determining whether an official is entitled to qualified immunity generally requires a two-step inquiry.  *See generally Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808 (2009).  First, the Court must decide whether the evidence, if believed, makes out a violation of a constitutional right.  *Id*. at 815-16.  Second, if the plaintiff has satisfied the first step, the Court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  *Id*. at 816.  It is no longer necessary for courts to perform the two steps in sequential order.  *Id*.  In its discretion, the Court is permitted to consider the former step, first and, if satisfied, exclusively.  *Id*. at 818.  The Court so elects here.

Although there exist innumerable cases regarding grooming *policies* and forced haircuts performed pursuant thereto, the Court has had less success finding a case involving forced haircuts for purposes of safety and security during the exigent circumstances of a search immediately after a serious prison riot.  It certainly cannot be said that there existed, at the time of the forced haircuts at issue here, some definitive Fourth Circuit or United States Supreme Court decision declaring such actions unconstitutional.  Moreover, *Whitley* reminds the Court that the proportionality of any use of force is to be measured against the seriousness of the circumstances surrounding it.  *See Whitley*, 475 U.S. at 321.  Making application of that principal here, it does not seem out of proportion for prison officials to elect to shave the heads of inmates, ostensibly and

circumstantially involved in a prison riot of serious dimensions, where two sets of keys were missing. The threat was serious and urgent. Both efficiency and security arguably demanded the action. Certainly, on these facts, the defendants had no reason to believe that it was a firmly established rule that such action was impermissible, constitutionally speaking. Such is the touchstone of the qualified immunity inquiry. Accordingly, the forced haircut portion of the plaintiff's excessive force claim should be dismissed.

The plaintiff does not make any argument which would materially change the applicable facts, to wit, that the keys were, in fact, *not* missing. The Court's conclusion might, of course, be different if there existed some evidence suggesting simply a gratuitous, even retaliatory, sheering. The law established at the time might certainly have spoken with more clarity to those facts. While the plaintiff contests his own involvement in the riot, that point seems incidental. First, the plaintiff has not put forward evidence that the defendants did not have reason to *believe* he was involved. Second, the plaintiff need not have been involved in the riot to have harbored the missing keys. His physical proximity to the incident made him a reasonable suspect, regardless of his specific involvement in the actual riot itself.

This analysis may speak more to whether a constitutional violation occurred. Certainly, the right to be free from excessive force existed at the time of the incident. It seems less reasonable that it could have been understood that such a right was violated on the facts at issue in this case. To that level of specificity, it cannot be said that the law was clearly established.

Regardless of the step at which it is considered, the Court would find the defendants

entitled to qualified immunity on the forced haircut claim.

**V.      Defendant Lt. Smalls**

Because the above defenses are effective as against the plaintiff's remaining claims, all of the defendants benefit from their dismissal *with prejudice*, to the extent the district court agrees.  Claims against Defendant Lt. Smalls would also be subject to dismissal *without prejudice* because he has never been served.

## CONCLUSION

Wherefore, based upon the foregoing, it is recommended that the defendants' motion for summary judgment [Doc. 90] should be GRANTED as to all claims.  If the district court declines to adopt the recommendation concerning the applicable statute of limitations and exhaustion, then the Court would recommend dismissal of the forced haircut element of the plaintiff's claim but not the excessive force element.

s/Bruce Howe Hendricks
United States Magistrate Judge

February 4, 2010
Greenville, South Carolina

**The plaintiff's attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 10768
Greenville, South Carolina 29603

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).